UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MICHAEL L. HILKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:08-CV-56 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Michael L. Hilkey appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Hilkey applied for DIB and SSI in February 2004, alleging that he became disabled as of June 6, 2003.[2] (Tr. 69-71.) This application was administratively denied (Tr. 36), and Hilkey again applied for SSI in September 2004 and DIB in October 2004, also alleging June 6, 2003, as the date of disability. (Tr. 83-91, 226-36.) The Commissioner denied his application initially and upon reconsideration, and Hilkey requested an administrative hearing. (Tr. 27-35, 59-60, 226-36.) Administrative Law Judge (ALJ) Terry Miller conducted a hearing on January 12, 2007, at which Hilkey, who was represented by counsel; Becky O'Reilly, Hilkey's fiancée; and a

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Hilkey's date last insured for DIB was purportedly September 30, 2008. (Tr. 67.)

vocational expert ("VE") testified. (Tr. 250-97.)

On June 15, 2007, the ALJ rendered an unfavorable decision to Hilkey, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 14-26.) The Appeals Council denied Hilkey's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-10.) Hilkey filed a complaint with this Court on February 20, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) Hilkey's sole argument on appeal is that the ALJ improperly evaluated his symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 12-16.)

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the alleged onset date, Hilkey was forty-six years old, but he turned fifty years old prior to the hearing decision in this case. (*See* Tr. 69.) Hilkey has a high school education and past work experience as an auto mechanic and maintenance worker. (Tr. 79, 111.) Hilkey alleges that he became disabled due to extrapyramidal disease,[4] restless leg syndrome, high blood pressure, pain disorder with psychological factors and a general medical condition, depression, and anxiety. (Tr. 73; Opening Br. 2.)

### B. Summary of Relevant Medical Evidence

In July 2003, Hilkey saw Dr. Douglas Boss, his family physician, with complaints of

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 297-page administrative record necessary to the decision.

[4] "Extrapyramidal disease is any one of a group of disorders characterized by involuntary movements (as chorea, parkinsonism) and caused by disease of the extrapyramidal nerve pathways." (Opening Br. 2 (citing 2 J. E. SCHMIDT, M.D., SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, E-218-19 (1994)).)

intermittent restless leg syndrome, which had been ongoing for a month. (Tr. 145.). He described the pain as achy and burning, which was relieved by walking and rubbing his legs. (Tr. 145.) He also had problems sleeping. (Tr. 145.) Hilkey told Dr. Boss that he had a lot of life stressors, both financial and personal. (Tr. 145.) Hilkey's peripheral vascular examination was normal, but Dr. Boss ordered laboratory tests. (Tr. 145.)

Hilkey returned to Dr. Boss in November, complaining that the symptoms of his restless leg syndrome had progressed and that he now had great difficulty sleeping. (Tr. 144.) Dr. Boss noted that Hilkey had cancelled an appointment at the end of July and not followed-up. (Tr. 144.) Dr. Boss reported that Hilkey's laboratory tests were normal, that he did not take some recommended medications, and that he had been out of his medications "for some time." (Tr. 144.) On examination, Hilkey's extremities were unremarkable and he had no focal neurologic deficits, but he had a flat affect and "state[d] repeatedly his inability to work and his desire to receive some sort of disability." (Tr. 144.) Dr. Boss assessed leg pain/restless leg syndrome and probable depression and prescribed Amitriptyline. (Tr. 144.)

In February 2004, Hilkey went to the emergency room ("ER") for chest pain, heart palpitations, shortness of breath, and pain in his shoulder blade. (Tr. 115-21.) Hilkey complained that over the last few months, multiple times a day he felt "his heart stop for just a brief moment of time." (Tr. 115.) A chest x-ray and EKG were negative but another test was consistent with hyperventilation. (Tr. 116.) Although Hilkey was taking blood pressure medication, he was not taking the Amitriptyline. (Tr. 116). The diagnosis was shortness of breath and chest pain. (Tr. 116.) Hilkey followed up with Dr. Boss about a week later, providing "a rather histrionic presentation of his symptoms," including shortness of breath,

obstruction in the throat, chest pain, and the impending sensation that his heart was going to stop. (Tr. 143.) Dr. Boss noted that the ER work-up was normal and that his examination of Hilkey was unremarkable. (Tr. 143.) His assessment was globus hystericus[5] and "question angina." (Tr. 143.) Dr. Boss believed Hilkey's problem was muscle tension and recommended a treadmill stress test. (Tr. 143.) The doctor stated that Hilkey was "eager" to conduct the test but that he is currently without insurance and wanted to postpone testing and any future visits until March 2004 when he believed he would have Medicaid; the doctor agreed. (Tr. 143.)

In March 2004, Y. Pogorelov, M.D., performed a consultative physical exam to evaluate Hilkey's complaints of restless leg syndrome, extrapyramidal disease, hypertension, and depression. (Tr. 122.) Hilkey complained of leg weakness, bilateral arm and leg pain, and muscle tightness, and explained that his leg symptoms had spread to his arms. (Tr. 122.) Hilkey also stated that "he is not able to walk more than 5 minutes, stand 1 minute, sit 10 minutes or lift more than 30 lbs due to leg weakness and pain." (Tr. 123.) On examination, Hilkey had steady but very slow gait without assistive devices, could not walk on heels and toes but could tandem walk, and was able to squat one-half way down and rise. (Tr. 123.) Hilkey had an active range of motion; no swelling or effusion of the joints; minimal stiffness of the elbows, shoulders and knees; and negative straight leg raising. (Tr. 123, 125.) Hilkey also had symmetrical and 5/5 muscle strength and normal deep tendon reflexes. (Tr. 123.) His gross movements were normal but a bit stiff, and his fine finger manipulation was normal. (Tr. 123.) Dr. Pogorelov opined that Hilkey could not walk or stand for two hours in an eight-hour day due to leg and arm pain and weakness. (Tr. 123.) His impression was that Hilkey had extrapyramidal disease that was

---

[5] Globus hystericus is "difficulty in swallowing; a sensation as of a ball in the throat or as if the throat were compressed[.]" STEDMAN'S MEDICAL DICTIONARY 813 (28th ed. 2006).

worsening, well-controlled hypertension, and possibly depression. (Tr. 123.)

In April 2004, Barbara Gelder, Ph.D., a licensed psychologist, interviewed and performed a mental status examination on Hilkey at the state agency's request. (Tr. 126-30.) Dr. Gelder noted that Hilkey's complaints were primarily physical and he rated his depression a two on a ten-point scale, although he admitted problems with anxiety and worries. (Tr. 126-27.) Dr. Gelder observed that Hilkey did not use assistive devices but that he had a slow, hobbled gait. (Tr. 129.) She diagnosed anxiety and pain disorder with both psychological factors and a general medical condition. (Tr. 129-30.) She also noted that Hilkey had psychosocial stressors such as inadequate finances and inadequate health insurance. (Tr. 130.) His current Global Assessment of Functioning ("GAF") score was 62 and past 65, indicating some mild symptoms.[6] (Tr. 130.)

On May 5, 2004, Dr. R. Wenzler, a non-examining State agency physician, reviewed the file and concluded that Hilkey could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and frequently climb, balance, stoop, kneel, crouch, and crawl. (Tr. 131-38.)

On May 6, 2004, Dr. R. Klion, a non-examining State agency psychologist, found that Hilkey had no severe mental impairments. (Tr. 183-96.) Another non-examining state agency

---

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*. And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*.

psychologist affirmed this opinion on February 11, 2005. (Tr. 183.)

On November 20, 2004, Farbat Usman, M.D., performed a consultative physical exam. (Tr. 171-74.) Dr. Usman noted that Hilkey's symptoms were consistent with extrapyramidal disease. (Tr. 171.) Hilkey told Dr. Usman that he had problems sleeping, that especially in the morning he could not bear weight, and that the pain spread to his ankles and was continually in the calves. (Tr. 171.) Hilkey stated that his medications helped. (Tr. 171.) He also reported muscle spasms, swelling, and irregular heartbeat. (Tr. 171.) Hilkey explained that he has not been to a cardiologist for his irregular heartbeat, but was waiting for Medicaid to be able to do the stress test. (Tr. 171.) On physical exam he limped, and although he could walk on heels, he could not walk on toes. (Tr. 172.) He could squat about one-half the way down and told the doctor that he could walk for about half a block before experiencing leg pain. (Tr. 172.) His range of motion was limited in the hip but normal elsewhere. (Tr. 172.) Hilkey had negative straight leg raising, 3/5 muscle strength in the lower extremities, 5/5 muscle strength in the upper extremities, and normal deep tendon reflexes. (Tr. 172.) Dr. Usman opined that Hilkey could "stand or walk for two hours in an eight-hour day if his extrapyramidal disease allows him." (Tr. 172.) Dr. Usman's impression was that Hilkey had restless leg syndrome and extrapyramidal disease that was worsening. (Tr. 172.) He stated that Hilkey's carrying and handling abilities were also affected. (Tr. 172.)

On December 15, 2004, Dr. F. Montoya, a non-examining State agency physician, found that Hilkey could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch,

6

and crawl. (Tr. 175-82.) Another state agency physician later affirmed this opinion. (Tr. 182.)

On February 22, 2005, Hilkey visited Dr. Boss, requesting medication refills and complaining that he continued to have significant restless leg problems. (Tr. 198.) He reported favorable results with Amitriptyline which he had previously stopped due to mouth dryness, and decided to try it again. (Tr. 198.) The physical examination was unremarkable, and the diagnosis was hypertension, globus hystericus, and restless leg syndrome. (Tr. 198.) His medications were refilled and adjusted to relieve some side affects. (Tr. 198.)

Hilkey returned to Dr. Boss in June 2005 for a left arm injury as a result of lifting an eighty pound bag of salt. (Tr. 197, 206.) The diagnosis was biceps tendon tear. (Tr 197.) Hilkey was referred to the orthopedic clinic due to his lack of insurance. (Tr. 197.) The next month, Hilkey visited Dr. Taylor Konkin at the orthopedic clinic. (Tr. 204-05.) The diagnosis was bilateral shoulder pain with likely biceps tendon tear and possible rotator cuff tear on the left as well. (Tr. 205.) An August 2005 x-ray of the right shoulder showed minor degenerative changes in the AC joint; the left shoulder x-ray was normal. (Tr. 202-03.) An MRI of the same date showed rotator cuff tendinosis with fluid, mild hypertrophy, and degeneration at the AC joint producing a degree of narrowing. (Tr. 199.) There was no evidence of rotator cuff tear. (Tr. 199.) Dr. Konkin saw him again on August 16, and Hilkey reported some improvement. (Tr. 200.) His diagnosis was bilateral shoulder impingement, and Dr. Konkin recommended a left shoulder injection, some physical therapy, and a rotator cuff strengthening exercise program. (Tr. 200.) Hilkey only wanted to try the rotator cuff strengthening exercise program at that time. (Tr. 200.)

In March 2006, Hilkey was seen as a new patient for treatment of his blood pressure at

7

the Neighborhood Health Clinic, Inc. (Tr. 207-10.)

In August 2006, Hilkey saw Dr. Boss for the first time in 14 months. (Tr. 212.) Dr. Boss noted that Hilkey had a history of hypertension and generalized questionable somatoform pain complaints. (Tr. 212.) He had been compliant with his hypertension medication but out of Amitriptyline "for some time." (Tr. 212.) Dr. Boss diagnosed hypertension and leg pain and prescribed medication. (Tr. 212.) They discussed trying to achieve "a balance between his understandable financial constraints and [the] need for more regular follow-up." (Tr. 212.) Hilkey explained that he was attempting to "achieve disability status" and believed that when he did he would have more finances to devote to treatment. (Tr. 212.) They agreed to schedule appointments once every four months. (Tr. 212.) In January 2007, Dr. Boss was unable to provide a statement for Hilkey regarding his abilities because he had not seen Hilkey in four or five months and Hilkey had cancelled several appointments. (Tr. 213-18.)

In February 2007, Dr. Gelder completed a questionnaire submitted by Hilkey's attorney about the psychological examination. (Tr. 219.) She reported that anxiety affected the severity, exacerbation, and maintenance of his pain. (Tr. 219.) Dr. Gelder explained that the anxiety and worries caused Hilkey to tense his muscles which exacerbated his pain. (Tr. 219.)

### C. Hilkey's Hearing Testimony

Hilkey testified that he is unable to work because of constant leg pain and tingling which limits his ability to walk, sit, and stand; he rated his average pain at a seven to nine on a ten-point scale. (Tr. 263-64.) He related that he has trouble sleeping and on a normal night he wakes up two or three times due to his leg movements, and sometimes he also wakes up in the morning with headaches. (Tr. 279.) Hilkey stated that he had been using a cane for the previous

8

month to maintain stability and balance, but it was not prescribed by a doctor. (Tr. 257.) He further testified that sitting for prolonged periods, qualified as a half hour, "is a real problem" that aggravates his condition. (Tr. 264-65.) He also said that he could walk about twenty minutes at a time; sit for one half-hour at a time with his leg elevated to relieve tingling; and stand for five to ten minutes at a time without his cane and one half-hour with it. (Tr. 270-71.) Hilkey also informed that he could lift ten pounds while standing and probably twenty pounds sitting down, and that he has problems bending, stooping, and climbing stairs (Tr. 273-74.)

Hilkey explained that he took Amitriptyline and aspirin for his leg pain and elevated his legs a total of two to three hours in an eight-hour day. (Tr. 265-66.) He stated that the medication helped control his leg condition (Tr. 269), that he never underwent physical therapy or injections for his leg pain (Tr. 266), and that no doctor has recommended surgery but they wanted to do further tests (Tr. 266-67). He further testified that he was seeking financial assistance for the additional testing, and that he had visited the Neighborhood Health Clinic for one appointment to seek financial assistance. (Tr. 267.) Hilkey also testified that he had problems with his throat and difficulty breathing, and that his doctors wanted to do further testing to rule out a heart condition. (Tr. 267-68.) He stated that he had anxiety, stress, and "minimal" concentration problems as a result of his leg pain, but he did not receive any treatment for these problems. (Tr. 274.)

Hilkey described his activities, stating that he drives without restriction; takes his fiancée to work; takes care of his personal needs; cares for his cats; does laundry, cleaning, and other household chores; uses a riding lawn mower in the summer; prepares meals; and periodically visits with family. (Tr. 258, 275-79.) He explained that he must take hourly breaks when

9

performing housework, sitting and elevating his legs for up to one-half hour. (Tr. 275, 280.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On June 15, 2007, the ALJ rendered his opinion. (Tr. 14-26.) He found at step one of the five-step analysis that Hilkey had not engaged in substantial gainful activity since his alleged onset date and at step two that Hilkey's extrapyramidal disease and/or movement disorder and

---

[7] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

11

restless leg syndrome, with associated anxiety and pain disorder, were severe impairments. (Tr. 17.) At step three, he determined that Hilkey's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 17.) Before proceeding to step four, the ALJ determined that Hilkey had the following RFC:

> [T]he claimant has the [RFC] to perform light work (lifting and carrying twenty pounds occasionally and ten pounds frequently and sitting or standing/walking a total of six hours each in an eight-hour period) that does not involve more than occasional postural movements. In addition, he is limited to performing simple, routine, repetitive tasks.

(Tr. 17.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Hilkey could not perform his past relevant work as an auto mechanic and maintenance worker. (Tr. 23.) At step five, he concluded that there are a significant number of jobs in the national economy that Hilkey could perform, such as electrical accessories assembler (500 jobs), wire worker (200 jobs), and cashier (1,000 jobs). (Tr. 24.) Therefore, Hilkey's claims for DIB and SSI were denied. (Tr. 26.)

### C. The ALJ's Credibility Determination Will Not Be Disturbed.

Hilkey asserts that the ALJ erred when evaluating the credibility of his symptom testimony. (Opening Br. 12.) Hilkey's argument ultimately falls short of warranting a remand.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

12

logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In reaching the credibility determination, the ALJ dedicated two lengthy paragraphs (about an entire page) to his reasoning. The ALJ began:

> Although [Hilkey] emphasized that he never was without pain in any type of activity he did no matter how long it was performed (even noting that he was in great pain when just sitting and answering questions at the hearing), the undersigned notes that the claimant failed to keep several appointments with his treating physician in late 2006. There is also no indication in the record that the claimant sought treatment for his allegedly disabling levels of pain at an emergency room or any free or reduced-fee clinics in late 2006. The undersigned finds that this is not consistent with disabling levels of pain. Furthermore, the claimant's treating physician, Dr. Boss, refused to complete a statement for the claimant and his attorney regarding the claimant's condition; thus there is no opinion of a treating source that the claimant's allegations are credible. Certainly there is nothing in the record to support a finding that the claimant needs to elevate one or both legs for two to three hours in an eight-hour period, that he can not sit or stand/walk for prolonged periods, or that he needs to hold his arms above his head due to tremors when he sits for prolonged periods.

(Tr. 22-23.)

The ALJ then took note of the claimant's behavior during the hearing, highlighting that he sat for about an hour before standing up, that he never shifted or seemed to be uncomfortable, that he seemed relaxed, that he did not have to elevate his legs, and he had no visible tremors. (Tr. 23.) The ALJ next stated that despite his claim of physical limitations and minimal concentration due to pain, he had not received counseling for mental health problems. (Tr. 23.) The ALJ emphasized that Hilkey admitted at the hearing that testing has yet to be performed to

13

show that his movement disorder was spreading about his body. (Tr. 23.) The ALJ also commented that even though Hilkey suffers from globus hystericus, his medications are helpful and Hilkey "admitted that he had no real pain from this problem." (Tr. 23.)

Furthermore, the ALJ considered Hilkey's testimony about his daily activities, finding that he "appears to be fairly active[,]" and noting not only the various household tasks Hilkey undertakes, but also that he injured himself carrying an eighty-pound object, indicating that he has more capabilities than he asserts. (Tr. 23.) The ALJ pointed out that Dr. Boss's notes contain Hilkey's statements regarding his desire to receive disability. (Tr. 23.) Lastly, the ALJ explained that even though Hilkey's anxiety and worries exacerbate his physical condition, the objective findings do not support a limitation to sedentary or less demanding work. (Tr. 23.)

Yet, this lengthy and thorough analysis does not deter Hilkey from challenging the ALJ's reasoning. Hilkey first contends that the ALJ failed to explore reasons why Hilkey did not regularly seek treatment; in particular, that the ALJ ignored references in the record indicating that Hilkey's financial constraints precluded him from seeking treatment. (Opening Br. 14-15.) In his Reply Brief, Hilkey compares his case to *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008), in which the Seventh Circuit Court of Appeals held that an ALJ erred where she "drew a negative inference as to [the claimant's] credibility from his lack of medical care, [but] she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that [the claimant] had reported an inability to pay for regular treatment and medicine." *Id*. at 678-79.

The ALJ is entitled to consider Hilkey's failure to seek treatment, taking any explanations into consideration, when making the credibility determination. *See* 20 C.F.R. §§

14

404.1529, 416.929; *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (considering claimant's failure to seek medical treatment and use of only sporadic pain medication when discounting claimant's complaints of severe pain); SSR 96-7p. Here, the ALJ's opinion and the hearing transcript show that he was indeed aware of Hilkey's explanation for his noncompliance when making the credibility determination. In fact, Hilkey's hearing testimony revealed that he had financial constraints (Tr. 266-67), which the ALJ specifically mentioned in his opinion, stating with regard to his hearing testimony "that [Hilkey] is seeking financial assistance in order to have further testing done" (Tr. 18). The ALJ further noted that Dr. Boss "recommended that [Hilkey] undergo a treadmill stress test but [Hilkey] was not able to comply because he had no insurance" (Tr. 20); that Hilkey sought treatment at the Neighborhood Health Clinic (which was revealed during Hilkey's hearing testimony to be a place where he went to seek financial assistance for health care) (Tr. 21, 267); and that Hilkey and Dr. Boss discussed Hilkey's "difficulty in seeing a physician regularly due to financial constraints" (Tr. 21).

Indeed, the ALJ discussed medical records reporting Hilkey's inability to pay for treatment and also heard testimony about Hilkey seeking financial assistance for his medical care. (*See* Tr. 18, 20, 21, 267.) As a result, the instant case is plainly distinguishable from *Craft*, and Hilkey's argument that the "ALJ did not mention any of this information from the case record" is incorrect.

Hilkey also takes issue with the ALJ's reasoning he did not seek treatment at the emergency room or free or reduced-fee clinics for his allegedly disabling conditions. Hilkey

15

argues that he in fact sought treatment at three such clinics, and emergency room care would be inappropriate to treat his chronic condition. (Tr. 15.) Hilkey's argument, however, misses the thrust of the ALJ's reasoning. The ALJ did not state that Hilkey never went to such clinics, but rather, that he did not go to them for his "allegedly disabling levels of pain." (Tr. 23.)

The ALJ apparently thought it significant that even though Hilkey previously went to the Neighborhood Health Clinic and the orthopedic clinic, for example, to treat his other conditions, such as hypertension and the shoulder injury, he did not go for his movement disorder in late 2006. (*See* Tr. 21 (discussing the medical records from the orthopedic and Neighborhood Health Clinic).) This reasoning, although not the ALJ's most compelling, does not appear to be "patently wrong." *Powers*, 207 F.3d at 435; *see also Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (affirming an ALJ's credibility determination, even though it was "a bit harsh" due to the fact that the claimant did not pursue treatment because of financial constraints, and explaining that "an ALJ's credibility assessment will stand as long as [there is] some support in the record" (internal quotation marks and citation omitted)). While the ALJ perhaps could have better explored Hilkey's reasons for not attending these clinics for his allegedly disabling disorder, Hilkey does not demonstrate how further questioning would have impacted the ALJ's decision-making on this point, especially since the ALJ had already considered that Hilkey faced financial obstacles. *See generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("So the administrative law judge's opinion is vulnerable. But that is nothing new. No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

Hilkey next objects to the ALJ's reasoning that he "appears to be fairly active" based upon his daily activities and argues that the ALJ "failed to consider the entirety of his testimony[;]" specifically, testimony that Hilkey does not sleep well and that he takes hourly breaks for as long as a half-hour when performing household chores. (Tr. 23; Opening Br. 15-16.) It is true that "[a]lthough a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (citation omitted). Hilkey's assault on the ALJ's reasoning, however, is unpersuasive, because the ALJ did take into account the whole of Hilkey's testimony.

In discussing the hearing testimony, the ALJ *specifically mentioned* a considerable amount of Hilkey's testimony about his alleged limitations, and in particular, "that he must take breaks every half hour when he is doing household chores," and "that he wakes up two or three times per night," and "wakes up with headaches." (Tr. 18.) The ALJ also *explicitly considered* Hilkey's testimony that "he must elevate his legs waist high for a total of two to three hours per day[;]" that "he is able to walk for just twenty minutes, stand for just five to ten minutes without a cane and for just thirty minutes with a cane, sit for just thirty minutes, and lift just ten pounds when he is on his feet and just twenty pounds when he is seated[;]" that "he has problems bending and stooping[;]" that "he does very little shopping because of his leg problems[;]" and that "his leg problems make him feel stressed[.]" (Tr. 17-18.)

Thus, the ALJ did not "select and discuss only that evidence that favors his ultimate conclusion," *Herron*, 19 F.3d at 333, but rather considered Hilkey's qualifications about how he carried out his daily activities, *cf. Craft*, 539 F.3d at 680 (noting that the ALJ ignored the

17

claimant's qualifications as to how he carried out his daily activities). The ALJ simply concluded that, in light of the amount and variety of the activities that Hilkey stated that he *does* perform, such as chauffeuring his fiancée to and from work, "swiffering" the wood floors, washing and drying dishes, using a riding lawn mower, preparing meals, and going out to eat (*see* Tr. 18, 23), Hilkey's testimony of completely disabling pain, such as "he never was without pain in any type of activity he did no matter how long it was performed" and that "he was limited in all physical activities[,]" was not credible. (Tr. 22-23.) Though Hilkey may disagree with the ultimate weighing of the evidence, such disagreement is not a basis for remand. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner.").

Furthermore, an ALJ may consider a claimant's daily activities as a factor when assessing the credibility of a claimant's complaints. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p; *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility). Here, the ALJ properly considered that Hilkey's daily activities included performing various household activities, contradicting his statements of disabling pain; thus, he did not improperly equate this evidence with an ability to work full-time. *Compare Schmidt*, 395 F.3d at 746-47, *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

Lastly, Hilkey maintains that although the ALJ accommodated the effects of his pain disorder on his mental abilities by limiting him to "fairly unskilled, simple work activity," he did

not consider the combined effect of the impairments on his physical abilities. (Opening Br. 16.)
Hilkey overlooks, however, that the ALJ specifically addressed the impact of his pain disorder
on his physical functioning. The ALJ explained,

> *[A]lthough the claimant's anxiety and worries exacerbate his physical condition*,
> the undersigned finds no reason to limit the claimant to sedentary (or less) work;
> the objective findings regarding the claimant's physical condition do not support
> a more restrictive assessment of the claimant's [RFC] than set forth by the State
> Agency physicians in December 2004, and again in February 2005. These are the
> most recent assessment from these experts, which are given substantial weight. In
> addition, the claimant's mental impairments and their resulting limitations are
> reflected in the claimant's mental [RFC] that the claimant could perform only
> simple, repetitive, routine work.

(Tr. 23 (emphasis added and citations omitted).) Thus, the ALJ in fact found that his pain disorder impacted his physical condition, but not to the extent that it would limit him to sedentary work, based upon the objective medical evidence. Consequently, Hilkey's argument that the ALJ failed to consider the combined effect of his impairments has no merit.

In sum, the Court will not accept Hilkey's plea to reweigh the evidence in the hope that it will come out in his favor this time. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004). The ALJ has built an accurate and logical bridge between the evidence and his conclusion, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *id.*, will not be disturbed.[8]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

---

[8] Because the ALJ properly based his credibility determination on the reasons discussed *supra*, Hilkey's argument that the credibility finding cannot stand solely on his observations of Hilkey at the hearing (Opening Br. 16-17) is rendered inconsequential.

19

Clerk is directed to enter a judgment in favor of the Commissioner and against Hilkey.

SO ORDERED.

Enter for this 9th day of December, 2008.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge